**Henry Y. MILLS, Appellant,**

v.

**RESERVE LIFE INSURANCE COMPANY, Appellee.**

Court of Appeals of Kentucky.

May 20, 1960.

R. P. Moloney, Jr., Lexington, for appellant.

Julian W. Knippenberg, Boehl, Stopher, Graves & Deindoerfer, Lexington, for appellee.

STEWART, Judge.

This is an appeal from a summary judgment entered by the Fayette Circuit Court against appellant, Henry Y. Mills, on motion of appellee, Reserve Life Insurance Company. The court also issued an order sustaining appellee's motion to strike all affidavits filed by appellant in opposition to appellee's motion. This appeal is from these rulings of the lower court.

On August 3, 1955, appellant, an illiterate person who was then 58 years of age, executed applications for insurance with appellee which resulted in the issuance of three contracts described as (1) an accident policy, (2) a medical surgical policy, and (3) a hospital and surgical expense policy. No medical examination was required. On January 17, 1957, due to injuries sustained at the junk yard where he worked, appellant became totally and permanently disabled. He undertook to collect from appellee on his policies. Appellee declined to pay, and this action ensued in which appellant claimed he was entitled to receive benefits under the three policies for the total sum of $7000.

In the lower court, appellee defended its refusal to pay appellant on the ground that he made false answers to the same questions in each of the three written applications signed by him, which answers were material to the risk assumed under the contracts of insurance.

Appearing, among other questions, on each of the applications, was the following one, and we give the particular part that is pertinent: "Have you * * * ever had * * * diabetes?" Appellant's response was "No." It was stipulated by the parties hereto that on August 3, 1955, when appellant applied for these three policies, he knew he was suffering from diabetes.

Another significant question in each of the applications was: "Have you * * * received medical or surgical advice or treatment within the past three years?" Appellant's answer to this question in each instance was "No." On this point there appears in the record this agreed order: "It is further stipulated that the plaintiff was a patient in the Hurst Snyder Hospital in Hazard, Kentucky from January 3, 1955 to January 20, 1955 and was receiving medical care and treatment during that period for diabetes, regulation of his diet and regulation of the correct insulin dosage for the treatment of diabetes."

The applications, which were made a part of each policy, contain no notice to the insured in respect to any limitations on the power of the insured's agent. However, each of the policies does set forth language to the effect that the insured's agents have no "authority to change this policy or to waive its provisions."

The reply filed by appellant alleged his inability to read and write the English language and his dependence upon the superior knowledge of appellee's agent when

he made the application for insurance. He further averred he was only asked by the agent his name, age, place of employment, marital status, and whether he had the amount of the first premium on his person. He denied he was ever asked if he had the illness known as diabetes. He claimed he was told to sign each application at a place marked "x", and that the terms and conditions of each application were not read to him before or after he signed it.

As the falsity of the answers to each of the questions quoted in the signed applications is admitted, one of the primary issues raised is, even if the agent put down untruthful answers when the insured told him the truth, may the insured recover on the policies?

The recent case of Reserve Life Insurance Company v. Thomas, Ky., 310 S.W. 2d 267, 269, involved a contract of hospitalization insurance practically identical to one of the policies now being considered. The policy there was placed in force pursuant to an application in every respect similar to those embraced in the record before us. In the Thomas case recovery was sought on the basis that the insured explained his illness to the insurer's agent and the latter failed or wilfully refused to put down truthful answers in the application the insured signed. Although the insurer admitted the agent may have made false insertions, this Court, in reversing a judgment based upon a verdict the jury returned against the insurer, held:

" * * * If the agent of the Company put down wrong answers in order to sell the policy, the applicant nevertheless signed the application. Was there a duty on the applicant's part to read the application which was filled in by the agent? Or is the applicant entitled to rely upon the agent, who is presumably experienced in the field of insurance, and to take for granted that the agent acted properly within the scope of his authority? The answers to these questions are important be-

cause a hard and fast rule on the subject could lead to an insurance company unjustly avoiding payment on a policy as well as affording an opportunity to an applicant to obtain insurance when he was not entitled to it.

"The misrepresentations here involved were made in the inception of the insurance contract, and parol evidence should be admitted to show the circumstances under which the insurance policy—the contract—was procured. The courts of the country do not agree * * * on the effect of the insured's failure to read either the policy or the application for it. See Vance on Insurance (1951 Hornbook), Section 44. This court recently has placed more responsibility on an applicant for insurance to see to it that his representations to the company approach the truth, Commonwealth Life Insurance Co. v. Keen, 1950, 331 [313] Ky. 301, 231 S.W.2d 78; Metropolitan Life Insurance Co. v. Tannenbaum, 1951, Ky., 240 S.W.2d 566; National Life and Accident Insurance Co. v. Scott, 240 S.W.2d 849, and, according to Vance, the trend in recent cases is in this direction."

The only difference between the Thomas case and the one at bar is that Thomas, the insured in that case, could read, whereas the insured with whom we are dealing maintains he could neither read nor write. He argues in this connection he was unable to see to it that his representations appearing in the applications approximated the truth. This contention is specious. A handicap which makes it more difficult for one to fulfill a duty does not have the effect of excusing the duty. This principle of law taken from 12 Am.Jur., Contracts, sec. 137, p. 630, is in full force in this jurisdiction and answers the point raised by appellant:

"If a person can not read the instrument, it is as much his duty to procure some reliable person to read and ex-

plain it to him, before he signs it, as it would be to read it before he signed it if he were able to do so, and his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents."

See also Metropolitan Life Insurance Co. v. Tannenbaum, Ky., 240 S.W.2d 566, 567, where this Court ruled that an illiterate person was "bound to take notice" of the terms of the application he signed.

KRS 304.656 reads: "All statements or descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, unless material or fraudulent, shall not prevent a recovery on the policy."

■ The rule is that a false answer is material if the insurer, acting reasonably and naturally in accordance with the usual practice of life insurance companies under similar circumstances, would not have accepted the application if the substantial truth had been stated therein. See John Hancock Mutual Life Ins. Co. v. DeWitt, 259 Ky. 220, 82 S.W.2d 317; Chamberlain v. National Life & Accident Ins. Co., 256 Ky. 548, 76 S.W.2d 628, and Sovereign Camp, W. O. W. v. McDaniel, 251 Ky. 212, 64 S.W.2d 581.

As previously stated, the answers to the questions in each application were admittedly false; therefore, the query is: Were they material to the risk assumed by appellant?

Appellee, upon learning that appellant had diabetes on and before the date of application, informed him the policies were cancelled ab initio and offered to return all premiums. Appellee also averred in its answer that had it known of the diabetic condition of appellant, it would not have issued the policies.

In Appleman's Insurance Law and Practice, sec. 214, p. 210, it is stated: "Thus, the majority rule is at the present time that a misrepresentation as to the applicant's state of health is material *as a matter of law* and proof of the falsity thereof will avoid the contract. Likewise, the statement of the applicant that he had never suffered from disease, or his denial of ever having suffered from certain specified diseases or disorders is material *as a matter of law* so as to avoid the contract in the event of the falsity thereof." (Italics ours.) In the same treatise in section 245, on page 270, this language appears: "The rule seems to be that where the applicant declares that he has not received medical or surgical care and attention and such statement is false, that it must be considered materia' *as a matter of law* so as to preclude recovery under the policy." (Italics ours).

■ Diabetes is a notoriously serious and chronic malady for which there is no known cure. As is evidenced by this very case, a victim of the disease frequently requires hospitalization in order to arrest and contain the illness and to prevent its taking a fatal course. It is well known that considerable medical expenses must attend the continuous regulation and treatment of diabetes. The determining fact on this point is simply this: If appellee had *known* about the condition of appellant's health and had *known* that he had recently been hospitalized for the treatment of diabetes, it would not have issued these insurance policies to him. The misrepresentations set forth in the applications, therefore, were directly material to the risk.

A procedural point is raised to the effect that the lower court erred in ordering the affidavits of appellant, filed in opposition to appellee's motion for summary judgment, to be stricken from the record. The undisputed facts in this connection are that a hearing was held on a motion for summary judgment on May 2, 1958, but, for a reason not explained, the order sustaining this motion was not entered until the fol-

lowing May 14th. After the date of the hearing, the above affidavits of appellant were tendered on the succeeding May 13th and May 14th. On July 2, 1958, on appellee's motion, an order was filed striking them.

█ CR 56.03 states, in part: "The motion (i. e., for summary judgment) shall be served at least 10 days before the time fixed for the hearing. The adverse party *prior to the day of hearing* may serve opposing affidavits." Once the hearing was held, on May 2, 1958, appellant's opportunity to file affidavits had passed, as clearly stated by the wording of CR 56.03. Since appellant filed affidavits on May 13th and 14th, they were at least eleven days late and therefore were properly ordered stricken from the record.

We have reached the conclusion that the falsity of the representations in the application and the materiality of these to the risk involved were undisputed facts in the instant case and, as a consequence, the lower court was fully justified in granting summary judgment to appellee.

Wherefore, the judgment is affirmed.

PALMORE, J., dissenting.

PALMORE, Judge (dissenting).

The view that one who applies for a policy of insurance cannot be heard to say that he did not read the application before signing it is reasonable only if the applicant is able to read. Applied to an illiterate person, on the theory that he ought to obtain the services of a third person to read the application for him, such a principle simply ignores the realities of life. We know, for example, from the frequency of this type of case in the courts that even the average man who can read and write, and who is educated and experienced, is apt to trust the agent from whom he purchases an insurance policy to the extent that he permits the agent to fill out the application and then signs without reading it. How often can it really be expected that an illiterate person would be so circumspect as to realize that he ought to secure the services of some disinterested party before signing the application?

In Metropolitan Life Ins. Co. v. Tannenbaum, Ky.1951, 240 S.W.2d 566, 571, Judge Moremen wrote that he was able to concur in the majority opinion only on the ground of stare decisis, not on the basis of its legal philosophy. But "the inn that shelters for the night is not the journey's end. The law, like the traveler, must be ready for the morrow. It must have the principle of growth." Cardozo, The Growth of the Law, p. 20. Certainty and order are the sole objectives of stare decisis. But the judicial process, in which stare decisis plays only a part, seeks to correct deformities as well as uncertainties. Ibid., p. 19. I believe the rule stated in 12 Am.Jur. 630, the Tannenbaum case, and the majority opinion in this case is conducive to injustice. Therefore, I would overrule the Tannenbaum case and permit a jury to determine whether the agent or the illiterate applicant was responsible for the omissions in the application.